Kenneth P. Steinreich v. Commissioner.
Steinreich v. Commissioner
Docket Nos. 97390, 97391.
United States Tax Court
1943 Tax Ct. Memo LEXIS 7; 2 T.C.M. (CCH) 1199; T.C.M. (RIA) 43538; December 31, 1943
*7 Richard W. Wilson, Esq., and J. B. Wegman, Esq., 60 Wall St., New York, N. Y., for the petitioner. George R. Sherriff, Esq., and Richard D. Duncan, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: On motion of respondent these two proceedings - Docket No. 97390 and Docket No. 97391 - were consolidated. In the first proceeding the following deficiencies were determined and fraud penalties claimed: Year
Deficiency
Fraud Penalties
1927
$ 86,715.01
$ 43,357.51
1928
78,810.24
39,405.12
1929
238,416.24
119,217.41
1930
142,470.50
71,253.54
1931
9,371.84
4,685.92
1932
3,748.88
1,874.44
Total
$559,532.71
$279,793.94
In the second proceeding - Docket No. 97391 - a deficiency in the amount of $1,227.03 was determined for the year 1935. In the first proceeding the question is whether certain deposits and credits to bank and brokerage accounts in petitioner's name were income to him, and if so, whether he failed to report them as such because of a fraudulent intent to evade taxation. Unless fraud is proved, the deficiencies are barred by the statute of limitations, and it follows that the fraud penalties stand or fall with the *8 deficiencies. The second proceeding - Docket No. 97391 - pertains solely to the year 1935 and involves a question of loss on certain stock. Petitioner in his return claimed the stock became worthless in that year. Respondent asserted that it became worthless in a prior year. Alternatively, respondent asserts that even if the stock did become worthless in 1935, still the loss should be reduced as petitioner overvalued the cost basis. Findings of Fact Petitioner resided at 47 Bretton Road, Scarsdale, New York, at the time of the hearing. He was 42 years old and had been a resident of New York State all his life. During the years 1921 to 1926 petitioner had various business interests. He was successively employed as a salesman for a rubber company, salesman for a paper company, agent for a real estate company, and throughout the period connected with the illegal beer business. During these years, and possibly some previous years he accumulated some $50,000 or $60,000 which he kept in a safe deposit box in a New York bank. Certain of his income during the years 1921 to 1926 was derived from illegal sources and was not reported in his income tax return. He paid an income tax of $15.19 *9 for the year 1925 and a tax of $17.25 for the year 1923. Returns for these years have been destroyed by the Bureau of Internal Revenue. There is no record of his having filed returns in any of the other years 1921 to 1926, inclusive. Petitioner made returns for the years 1927 and 1928 - the first years here involved - but these have been destroyed by the respondent under a general authority from Congress. Petitioner paid a tax of $23.30 on his 1927 income and $75.50 on his income for 1928. On March 14, 1930, petitioner filed his income tax return for the year 1929 with the collector for the third district of New York. The return showed a tax due of $48.62. On March 11, 1931, he filed his income tax return for the year 1930, reflecting a tax due of $204.37, with the collector of internal revenue for the third district of New York. On July 19, 1931, petitioner filed amended returns for the years 1929 and 1930. The amended return for 1929 was the same as the original return, except the amended return reported real estate commissions of $850; interest received, $124; and an increase in the deductions claimed for interest and taxes paid. The amended return for 1930 was the same as the *10 original return except that petitioner included $477.50 as unaccounted deposits described as commissions earned. The amended return also increased slightly the interest deduction. These amended returns were filed as a result of an investigation by the revenue agent's office. Returns for the years 1931, 1932, and 1935 were also filed with the collector for the third district of New York in due course. Samuel Hoffberg, a certified public accountant, prepared petitioner's returns for the years in question, except the amended returns of 1929 and 1930. He could not recall whether there was any unusually large amount of gross income reported in 1927 or 1928. The subject of any receipts by way of income or gifts from a man by the name of William F. Donnelly was never discussed between him and petitioner. The latter never advised Hoffberg of any income or gifts he might have received as a result of purchase or sale of malt and hops and no such items were reported in the returns in question. Hoffberg had no independent knowledge of petitioner's affairs and made the returns solely on the basis of information supplied to him by petitioner directly or by others at petitioner's direction. In *11 1926 petitioner became associated in business with the Phoenix Warehouse Corporation, located at 452 to 460 West 26th Street, New York, adjoining the Phoenix Cereal Beverage Company, sometimes hereinafter referred to as the brewery. These two companies were in buildings which, while separate, were joined by interior passages. The brewery was licensed to manufacture and sell near beer during the years in question, and it also engaged in the illegal operations of manufacturing and selling alcoholic beer. Petitioner was fully aware of this during the entire period in question. In order to conceal the illegal operations conducted within the brewery, malt, hops, and other supplies for the manufacture of beer used in the brewery were smuggled into it through the warehouse. In the latter part of August, 1927, a checking account in petitioner's name at the Pacific Bank was closed and in the same month a new checking account in petitioner's name was opened in The Century Bank of New York City. The initial deposit of $2,000 in The Century Bank was debited to the account in petitioner's name in the Pacific Bank. Sometime after the account in petitioner's name was opened in The Century Bank, *12 the bank became known as the Interstate Trust Company, and still later it became a part of the Chase National Bank. For convenience, this account will be referred to as the Century account. Petitioner was the only person to sign a signature card when this account was opened; he alone was authorized to draw checks; statements of the account were sent to him; and the bank had on file no power of attorney authorizing any other person to deal with it. This account was closed in June, 1930, and in the same month another checking account in the name of petitioner was opened in the Pennsylvania Exchange Bank of New York. Petitioner alone was authorized to deal with this account, and statements were periodically sent to him. A "special interest" account in petitioner's name was opened in the National Park Bank (which later became a part of the Chase National Bank) on May 19, 1927, and closed March 13, 1930. It is not disputed that this account belonged to petitioner alone. Another special interest account was opened in petitioner's name on February 3, 1927, with funds transferred from the account in petitioner's name in the Pacific Bank. This special interest account was in The Century Bank, *13 and petitioner was the only person authorized to deal with it or withdraw funds from it. Still a third special interest account was opened in June, 1930, at the Pennsylvania Exchange Bank. Petitioner was the only person authorized to deal with or withdraw funds from it. Interest of $47.92 was credited to the National Park interest account in 1929. Similar credits to the Century interest account totaled $567.41 in 1929 and $322.96 in 1930. During these years gross deposits in the following amounts were made to the accounts in question: 1927
"Pacific"
$ 205,917.04
"Century"
177,315.65
"Century"
8,000.58
National Park
1,507.00
Total
$ 392,740.27
1928
"Century"
$ 358,247.13
"Century"
2,311.98
National Park
43.35
Total
$ 360,602.46
1929
"Century"
$1,043,959.38
"Century"
5,857.47
National Park
86.06
Scarsdale National Bank
and Trust Co.
4,045.50
Total
$1,053,948.41
1930
"Century"
$ 570,512.16
"Century"
927.06
National Park
.03
Scarsdale National Bank
and Trust Co.
4,134.94
Pennsylvania Exchange
85,100.23
Total
$ 660,674.42
1931
Scarsdale National Bank
and Trust Co.
$ 9,156.93
Pennsylvania Exchange
192,516.05
Total
$ 201,672.98
1932
Scarsdale National Bank
and Trust Co.
$ 6,362.33
Pennsylvania Exchange
26,909.55
Total
$ 33,271.88
*14 Petitioner reported as income salaries of $10,450 in 1929, $10,400 in 1930, $10,400 in 1931, and $8,162.01 in 1932; he reported dividends of $3,191.73 in 1920, $3,095 in 1930, $2,209 in 1931, and $1,482.40 in 1932; he reported a commission of $850 in his amended return for 1929, and a commission of $477.50 in his amended return for 1930; he reported interest on bank deposits, etc., $124of in his amended return for 1929, of $240 in 1930, of $314.97 in 1931, and $330 in 1932; he reported a profit from the sale of real estate, stocks, etc., as $2,099.61 in 1930, and he reported $204.37 as income from partnerships in his amended return for 1930. Except for such of the above items as were deposited in the bank accounts in question, none of the other deposits therein were reported as income by petitioner. Reducing the gross deposits by such duplications as returned items, transfers from one bank to another, and transfers of money from brokerage accounts to bank accounts respondent in his deficiency notice determined net deposits includible in petitioner's income to be the following amounts: Year
Amount
1927
$ 381,876.24
1928
350,150.11
1929
1,031,036.16
1930
592,876.56
1931
58,163.31
1932
24,045.22
*15 The $50,000 to $60,000 which petitioner had accumulated during the years 1921 to 1926 was entirely spent in one way or another by 1930. During the year 1929 some securities were bought and sold for an account in the name of petitioner at a stock brokerage firm known as Shuyler, Earl & Co. Checks totaling some $27,000, drawn on the account in petitioner's name with The Century Bank and signed by petitioner were credited to this brokerage account in 1929. Dividends were received and credited to this account during 1929. Also credited to this account were the profits on the sale of certain rights to purchase Columbia Gramaphone stock in the amount of $1,384.96. On February 19, 1930, a letter signed by petitioner was sent to Schuyler, Earl & Co. requesting a statement of the account in petitioner's name for the year 1929 "so that I can use same in drawing up my Income Tax Report." This letter was on stationery with the letterhead "Phoenix Warehouse Corporation, 452 to 460 West 26th Street." The reply to this request was mailed to the petitioner at 448 W. 26th Street - his usual place of business. No person other than petitioner had authority to deal with or give orders concerning this *16 account. In the years 1929 and 1930 various securities were bought and sold for a brokerage account in the name of petitioner at the firm of Hamershlag, Borg & Co., and no person other than petitioner had authority to transact business in this account. During the years 1929 and 1930 checks amounting to some $9,000 drawn on the account in petitioner's name at The Century Bank and signed by petitioner were credited to the account in petitioner's name at Hamershlag, Borg. Monthly statements of this account were mailed to petitioner in 1929 in care of the Interstate Trust Co. (The Century Bank), and in 1930 similar statements were sent to petitioner at 448 West 26th Street. On February 19, 1930, a letter signed by petitioner and addressed to Hamershlag, Borg requested that a complete statement of the account in his name for the year 1929 be sent to him for use in drawing up his income tax return. This was done. A similar request of February, 1931, covering the account for 1930, was complied with. During 1929 there was a transfer at petitioner's request of Columbia Gramaphone stock from the account in his name with Schuyler, Earl to that with Hamershlag, Borg. The stock was dealt in *17 in both accounts and the records show several purchases and at least one sale. Petitioner reported a gain with respect to that stock, but a net loss in the amount of $1,298.96 was reflected in both the original and amended tax returns as a result of dealings in other securities in the Hamershlag, Borg, account in petitioner's name. No reference was made to the sale of the rights. Dividends credited to the account in 1929 were included in petitioner's original and amended returns for that year. The gain on the sale of 300 shares of Commercial Solvents stock made through this account in 1930 was also reflected in petitioner's original and amended returns for that year. In March, 1930, a signature card and a hypothecation agreement signed by petitioner were sent to Hamershlag, Borg, and in July, 1930, the account was closed and a check for $44.44 sent to petitioner who personally endorsed the same and deposited it to the checking account in his name in the Pennsylvania Exchange Bank. During 1931 there was a brokerage account in the name of petitioner at the firm of E. W. Clucas & Company. Checks drawn on the account in petitioner's name at the Pennsylvania Exchange Bank and signed by *18 petitioner, totaling some $40,985.25, were credited to this account. Statements of the account were mailed to petitioner in care of the Pennsylvania Exchange Bank, for the attention of Mr. J. W. Miller. In April and May of that year some 500 shares of Vacuum Oil Company stock were purchased for this account at a price of $20,175. In April 300 shares of Corn Products were purchased through this account at a price of $21,052.50 and a debit balance in that amount was reflected. On May 1, 100 additional shares of Corn Products were purchased at a cost of $6,267.50 and on the same day 100 shares were sold for $6,594. Dividends were credited to this account in 1931 and these were transmitted to petitioner and deposited in the account in his name in the Pennsylvania Exchange Bank. The Vacuum Oil stock was sold for $21,670, and this amount was remitted to the Pennsylvania Exchange Bank for credit to the account in petitioner's name there. On the same day that the Vacuum Oil stock was sold, 300 shares of Corn Products stock in the name of petitioner were sold through Eastman, Dillon Co. for $21,994.50. A check for this amount was delivered to the Pennsylvania Exchange Bank and credited to *19 the checking account in petitioner's name there. The profits on these sales were not reported in petitioner's income in 1931. There was no account at Eastman, Dillon in the name of petitioner but one was carried in the name of the Pennsylvania Exchange Bank. A brokerage account in the name of petitioner was opened at M. J. Meehan & Co. in January, 1931, and closed in April of the same year. Credits of some $3,300 to this account are reflected by corresponding withdrawals from the account in the name of petitioner in the Pennsylvania Exchange Bank. Correspondence regarding the account was addressed to petitioner care of the Pennsylvania Exchange Bank. Petitioner consistently used the various bank accounts to pay his own personal expenses. Many checks drawn and signed by petitioner and others drawn by Flaherty, an employee of petitioner, and signed by petitioner, represented purchases of expensive clothing for petitioner and his wife, dues in various clubs, general repair work done on their Scarsdale residence, public utility bills, insurance, doctor bills, and purchases of automobiles, jewelry, and certain securities other than those previously mentioned, such as stock in the Scarsdale *20 National Bank & Trust Co. Checks signed by petitioner and drawn on the various accounts for non-investment expenditures as far as the record shows amounted to some $21,000 in 1927, some $6,000 in 1928, a little over $1,000 in 1929, approximately $53,000 in 1930, some $134,000 in 1931, and approximately $3,600 in 1932. Some of the checks drawn on the various banks had been destroyed by petitioner in prior years. Nineteen checks drawn and signed by petitioner on the account in his name at The Century Bank between August 27 and December 14, 1927, totaling some $7,600, represented expenditures not larger than those typical of the years in question. The special interest account in petitioner's name at The Century Bank was regarded as security for overdrafts on the checking account. In the course of subsequent divorce proceedings in the Supreme Court of New York, it was judicially determined that during the years in question petitioner's living expenses averaged from $22,000 to $24,000 a year. In 1926 petitioner and his wife first occupied the Scarsdale house as their home. For some six months they occupied the premises under a lease, but then the property was purchased in the name of *21 the petitioner and two mortgages were given in his name. The property cost $45,000, and $18,000 was spent in improving it. All of this has been paid except a $12,000 mortgage still outstanding. Petitioner and his wife lived there from 1926 to 1932, and at the time of the hearing petitioner and his third wife were living there. At that time title to this property was in the Scarrett Realty Corporation, the stock of which was originally entirely owned by petitioner but at the time of the hearing was entirely owned by his present wife. Payments on the mortgages on this property were made by checks drawn on the accounts in petitioner's name and signed by him. During the years here involved petitioner carried over $100,000 in personal life insurance and retained the right to change the beneficiaries. The premiums on these policies amounted to approximately $2,700 per year and were paid from the bank accounts in question. Petitioner was at one time during the years in question the holder of approximately $10,000 worth of stock in the Pennsylvania Exchange Bank. He was also a director of that institution. He had close business associations with J. W. Miller during all the years in question *22 and was instrumental in securing for Miller his position as vice president of the Pennsylvania Exchange Bank. Donnelly was associated in some way with the warehouse with which petitioner was connected, and with the adjoining brewery for which the warehouse was used to store hops and malt. He had been a resident of the Chelsea district of New York City for some 45 years. He was engaged in the real estate business. During the years in question he was also a director of The Century Bank and spent considerable time securing business for that institution. He had a checking account and special interest account in that bank during the years when there was an account there in petitioner's name. During the years there was an account in the Pennsylvania Exchange Bank in petitioner's name there was also an account in the name of Donnelly. Donnelly's gross income as reported for tax purposes during the years 1926 to 1931 varied from approximately $9,700 to approximately $17,000. In 1932 his gross income was some $369. He and his wife lived on a modest scale at 402 West 22nd Street from 1919 until his death in January, 1933. Mrs. Donnelly was the administratrix of his estate but was never able *23 to find that he left money in the name of any other person. In 1932 Donnelly could not afford to give his wife a Christmas present, so he gave her his automobile which was then two years old. He suffered from a cancer for seven years before his death and in November, 1932, was forced to borrow $1,000 from his sister - a loan that was never repaid. His entire estate netted only $13.14, plus $19,000 in life insurance. The Pennsylvania Exchange Bank, having notice of Donnelly's death, honored checks drawn by petitioner on the account in petitioner's name after Donnelly had died. At the time of the hearing his widow was employed by a private family as a cook. Petitioner was divorced by his first wife in 1931 and in settlement of all claims against him paid her $15,000 in that year. This payment was drawn from the checking account in petitioner's name in the Pennsylvania Bank. He was divorced from his second wife in 1934. In the course of that proceeding the original ledger pages reflecting activity in the account in petitioner's name at the Pennsylvania Bank were produced in court. They were never returned to the bank; they were never seen by revenue agents, and they have apparently *24 disappeared. Prior to Donnelly's death there was never any accounting between him and petitioner with respect to any advances or loans made by Donnelly to petitioner. Petitioner filed a claim for $2,000 against Donnelly's estate, bue never tendered payment for any amount which may have been due Donnelly from him. Various securities purchased through the brokerage accounts in petitioner's name were retained by petitioner long after Donnelly's death. The bank accounts and the brokerage accounts in question were the property of the petitioner. Deposits in the bank accounts, representing income, and profits of the brokerage accounts were petitioner's, but were not fully taken into account in his income tax returns for 1929 to 1932, inclusive. Petitioner had knowledge of these facts at all times. A part of the deficiency for each of the years 1929 to 1932, inclusive, was due to petitioner's failure to report all of his income with a fraudulent intent to evade taxation. Petitioner claimed a loss in his 1935 return on account of the worthlessness of 350 shares of the stock of the Concord Casualty and Surety Company. This loss was disallowed. Opinion Except for the year 1935, to which *25 subsequent reference will be made, the fundamental issue is fraud. The statute of limitations has run as to the other years, 1927 to 1932, inclusive, and unless the respondent has succeeded in showing that the deficiencies determined were due at least in part to petitioner's fraud, they are barred. Correspondingly, if the deficiencies can be sustained by reason of the fraud, the fraud penalty will also attach for the same reason. Although the circumstances are vague and petitioner's statements on the subject conflicting, he now concedes, at least for purposes of this proceeding, that during the years involved he was associated in a more or less direct capacity with an enterprise involving the then illegal traffic in beer. [1] So much is categorically stated in his brief. The case thus resembles in general outline the numerous instances where the difficulty of deciphering the true facts and the absence of satisfactory records, is attributable to an illegal purpose apart from an intention to defraud the revenue. ; ; see , *26 affirmed ; , affirmed (C.C.A., 3rd Cir.), ; . As in those situations we must recognize that fraud "usually * * * must be gleaned from the several transactions in question and the conduct of the taxpayer relative thereto," , rather than by direct and circumstantial proof of each element. The reliance [2] of the petitioner, to escape a fraud penalty, upon an admitted involvement in some other breach of the law, however, cannot but lead to the inquiry whether one who is prepared to engage in criminal transaction in one field can be entitled to implicit reliance in disavowing other unlawful practices from which also a financial advantage is to be gained. Petitioner even admitted in another proceeding that only part of his income from illicit sources in some prior years had been reported for income tax purposes. *27 Notwithstanding this, we recognize the necessity that the respondent sustain his burden of proof and that under no circumstances is fraud to be lightly presumed. On the entire record and under all the circumstances we have concluded that fraud has been shown, that the deficiencies are not barred, and that the fraud penalties are properly determined as to the years 1929 to 1932, inclusive. We have arrived at the opposite conclusion as to the years 1927 to 1928. The record is voluminous and it would be difficult and certainly unprofitable to review it in detail, notwithstanding that all of it has been carefully examined and considered. Much of the evidence tending to inculpate petitioner will not even be referred to, but some of the reasons for our conclusion should be specified. In the first place, bank deposits and brokerage accounts running into large sums were maintained in petitioner's name during the period in question. All of the available records show that no other person was in a position to direct or control these accounts. Petitioner claims that they belonged to a man named Donnelly whom he professes to have regarded as his boss and who is said to have been associated *28 with the same unlawful transactions. Petitioner's description of this connection is stated tersely in his reply brief as follows: * * * "Donnelly" and the "brewery" were one and the same thing so far as the general public was concerned. Donnelly was the ostensible head of the enterprise, although he may have been acting for others who concealed their identity. Donnelly in turn used petitioner as a dummy. Steinreich regarded Donnelly as his "boss," because he was under Donnelly's personal supervision and received his orders and instructions from him. It is true there was some testimony indicating that the initiative in opening some of the accounts came from Donnelly rather than petitioner. But this would be conclusive of no more than that there was some sort of association between the two. Donnelly could as well have been an employee or a partner for all that this indicates, or it could even show no more than the interest, testified to by one of petitioner's witnesses, which Donnelly, as a director, manifested in obtaining new accounts for the bank. No one but petitioner could sign checks, no signature cards other than petitioner's were on file, statements were sent only to petitioner, *29 no records were produced nor evidently available that any consideration would be given to instructions from any one except petitioner and particularly from Donnelly. From all of the circumstances we are satisfied that there was prima facie proof of petitioner's ownership of the bank and brokerage accounts. . If, under these circumstances, petitioner's assertion is nevertheless true, and he was not the owner of the accounts, the burden of going forward, in our view, devolved upon him to prove it, or to prove to what extent, if any they were the property of others. He has made no effort to do the latter, contending throughout that the entire account belonged to Donnelly, and we are not satisfied with the proof he has submitted in attempting to do the former. His own testimony we disregard because in the number of times that he has been called upon to give his version of the facts he has varied them so considerably that it is impossible to say where the truth lies. He is partly corroborated to a limited extent by certain testimony to which we now refer, but we are unwilling *30 to rely upon it. The banks in which accounts were carried in the years 1929 through 1932 were Century-Interstate Trust Co., which we shall refer to as the Century, and the Pennsylvania Exchange National Bank, which we shall call Pennsylvania. An additional account in the National Park Bank is not in controversy since petitioner concedes ownership. Two principal witnesses testified for petitioner with respect to these accounts. Both submitted affidavits in late 1937 or early 1938, asserting that the accounts were opened by Donnelly, and that they did not meet the petitioner until months later. The witness Miller, who was a vice president of Pennsylvania, subscribes to the contents of the affidavit of the other witness, Tripp. There are reasons, however, why it is difficult to credit Miller's statements. Insisting that Donnelly's instruction were honored in connection with the account, he nevertheless admitted that the general practice of the bank was to require powers of attorney and signature cards from those whose instructions were to be followed, [3] and that although the account was Donnelly's and "everybody understood it that way, too," the bank continued to honor checks on the *31 account after it learned of Donnelly's death, and no effort was made to locate Donnelly's estate or to see that the funds reached their proper owner. Contemporaneously, Miller had described petitioner to an insurance investigator as "very comfortably situated," with a savings account in the Century of about $10,000 and a "business account" which "ran up into the high four figures." The witness was obviously under obligation to petitioner who, according to a statement made to the revenue agents by Tripp in 1927, was responsible for Miller's connection with the Pennsylvania Bank, - a circumstance corroborated by Miller on the witness stand. *32 This statement to the agents is itself a persuasive basis for discounting the testimony of these witnesses. It was earlier, nearer to the events themselves, and less likely to have been influenced by pressure from the petitioner. At that time Tripp stated categorically that it was Steinreich who was manager of the Phoenix Cereal Beverage Company (the brewery), and that so far as he knew "the checking account in the name of K. P. Steinreich in the Century Bank-Interstate Trust Co. was actually the account of Kenneth P. Steinreich." Since Miller states that he met Steinreich "originally at the same time that Mr. Dusan B. Tripp met him at the Century Bank," and that he "had read the affidavit of Mr. Dusan B. Tripp," and "it is not necessary for me to repeat in this affidavit the statements made by Mr. Tripp concerning this 'K. P. Steinreich' account," the statements of the two witnesses must stand or fall together, and an unwillingness to credit the one carries with it the same disposition as to the other. A similar conclusion follows with respect to a third witness, Haas, whose information about the account was stated to have been derived from the two witnesses mentioned. He, in fact, *33 discredits both those witnesses on the one hand, and petitioner on the other. [4]
*34 Another witness for petitioner testified with respect to an earlier bank account but had no knowledge of the circumstances surrounding the accounts in question; and an affidavit of a witness now dead, who stated that petitioner signed all checks in blank in advance, is contradicted by the testimony of another bookkeeper who testified that petitioner never signed checks in blank while he, the witness, was keeping the books, which was in 1930 and 1931, and that the witness made out checks on the account in question for petitioner's personal expenses, at petitioner's direction, and that they were then signed by petitioner. Items identifiable as such personal expenses constitute substantially all of the stubs in the only two check stub books which were produced. There is consequently no evidence upon which we are willing to rely which sufficiently sustains petitioner's burden of going forward with proof that the accounts, apparently his, were not so in fact. But there is a considerable mass of evidence looking in the other direction. The salary check, admittedly petitioner's own property, was, according to him, deposited regularly in the account in question. All of petitioner's personal *35 expenses and those of his household were apparently paid out of the accounts. These expenses were not niggardly; suits at $200, shoes at $45, and shirts at $15 were commonplaces among those personal items. A period of approximately three and a half months in 1927 shows 19 such checks totaling $7,600 which petitioner conceded were typical of the expenditures through the years in question. A rough computation thus puts his ordinary scale of living at approximately $26,000 a year, a figure not greatly at variance with the amount subsequently fixed by the New York Court, in connection with petitioner's divorce proceedings. Thus, in the four years from 1929 through 1932 petitioner's living expenses exceeded the approximate $10,000 of annual earnings which he reported by something in the neighborhood of $60,000. During most of this period Donnelly himself had an account in the same banks in his own name. And, perhaps as persuasive as anything is petitioner's admitted failure to have any accounting with Donnelly, who appears to have had limited means when he died, or to make any effort to return to him or his estate the funds, the securities, and the suburban residence, all of which petitioner *36 continues to insist belonged to Donnelly, and not to him. For the reasons stated and on the record as a whole we conclude accordingly, regardless of the prima facie case or burden of proof, that the evidence clearly and convincingly demonstrates that the accounts in question belonged to petitioner and, as far as there is proof, to no one else. Even so, respondent's case has not yet been made out. * * * The fact that large unexplained amounts passed through the petitioner's accounts in these years is not alone sufficient to justify the conclusion that the funds were all income, yet it is substantial evidence to be considered in determining the question. . The fact that he used the funds for his own private purposes is likewise important. . In such cases the conclusion that the receipts were income is sometimes drawn from the evidence as a whole because no other conclusion seems reasonable. . If the receipt by the petitioner of the funds in question did not represent either a gift to him or a return *37 to him of his capital, then their receipt must represent income to him. [ . Petitioner as, to be sure, advanced the assertion that he had at times secured "gifts" of considerable magnitude. But the contention does not reach the issue before us, for by 1929, according to petitioner's own story, he had discontinued the practice of accepting the gifts referred to and had substituted for it an agreement from Donnelly that petitioner could draw from the account any amounts he required for living expenses. This he himself regards, at least two points in the record, as "additional compensation." The highest figure attributed to the gifts was $8,000, and the amounts used by him in the years in question for living expenses apparently exceeded the combined total of his admitted salary and that figure. There is not the slightest contention on the part of petitioner that the enormous discrepancy between these amounts and the totals constituting the net bank deposits were or could have been gifts. For similar reasons, they could not have been returns of capital, first because petitioner's admitted capital as of 1926 was $50,000 *38 to $60,000, which would have been a small fragment of the amount of the net bank deposits in any year - and with the scale of living shown, this capital could not have been increased except out of unexplained sources of income; and second, because even this capital, on petitioner's statement, had been exhausted about the beginning of the period we are here considering. In addition, items which were indisputably of an income character were omitted from the returns in every year. Not only does the petitioner's own story itself convict him of failing to report part of the income which was paid to defray his living expenses and as additional compensation for his services, but his treatment of other undeniable income items also indicates a willingness to disregard the niceties of income tax reporting. We have already referred to accounts maintained at several brokerage firms in petitioner's name. Without going into detail, it is clear from the relationship between the bank accounts and the brokerage accounts that the owner of the one must have been the owner of the other. Dividends and profits in these brokerage accounts, as well as interest on the special interest bank accounts were, *39 of course, unquestionable income items, rather than gifts or return of capital. Yet, for example, we find petitioner in 1929 taking the benefit of a trading loss in one of the accounts, and reporting dividends of about $3,000, and only $124 of interest, although the account in the Century alone was credited with over $500 in interest; while in 1931 he reported interest on the special interest account, as well as dividends from the brokerage accounts, but omitted to report a profit of over $2,500 on the sale of securities from this account, also, of course, a clear item of taxable income. [5]
*40 We are satisfied to borrow again the language of the Mauch case that * * * the petitioner received substantial sums in each year from * * * clients [in this case, from undisclosed sources]; these sums were not the return of capital or a gift to the petitioner; they were deposited by the petitioner in his bank account along and commingled with other funds belonging to him; and they were used freely by him for his own benefit and enjoyment. The statutory definition of income freely includes items such as these. It follows that in all of the years from 1929 through 1932 petitioner was in receipt of large amounts of income which he did not report on his income tax returns. The circumstances and amounts were of such a nature that petitioner could not have been ignorant of their existence. Making allowances for errors in petitioner's knowledge of the law, it is still unreasonable to conclude that he could honestly have considered and rejected all necessity for reporting any of the items. The record leaves no alternative to a conclusion that some part of the deficiencies for the years 1929 to 1932 were due to petitioner's fraudulent failure to report known items of income. ; *41 Joseph Calafate, et al., supra; For the years 1927 and 1928 no returns could be produced. Their destruction by respondent in due course undoubtedly was entirely consistent with his authority, but the absence of the returns nevertheless leads to results unfortunate for him. For without them we are unable to ascertain what income petitioner reported or that any of his income was omitted. Even though the tax paid was small, inability to examine the returns precludes the possibility of eliminating from consideration legitimate offsetting deductions in large amounts. Since the burden is upon respondent, we regard the failure to produce the returns as fatal. The year 1935 involves a claimed stock loss. From statements made at the hearing and the absence of any reference in his briefs, we understand petitioner has abandoned this issue. Respondent's determination is accordingly sustained. Decision will be entered under Rule 50. Footnotes
1. Petitioner was asked: "You knew when you signed these checks on that account that you were participating in illegal enterprises? The Witness: "To the extent what I was doing by instructions, in assisting Mr. Donnelly, yes." And at another point: "And did you presume that he was handling his illegal business through your account? "To some extent." ↩
2. Petitioner testified in this proceeding at one time: "Did you say that Mr. Donnelly used this bank account of yours or your name for the clearing of checks? "That is true. "Whose checks? "His own checks. * * * * *
"Do you know why he did not clear them through his own account? "He must have had some reason for it. "You don't know what that reason was? "He did not explain it to me." And at another time he was asked: "* * * you were asked whether Donnelly gave you a reason, what was your answer? The Witness: "I don't recall my answer, but I knew what his reason was. "Did he tell you what his reason was? The Witness: "Yes."↩
3. Tripp testified similarly: "Q. Is your bank in the process [practice] of recognizing any person who is not the named depositor, to carry on business in the account? "A. First, for instance, A comes in and opens an account and says I want to open an account in my name but the funds in this account belong to B and B gives us a letter approving the opening of the account of A and A gives us a letter stating that the funds are not his. "Q. But that is the way you have some records showing the actual ownership of the account? "A. That is right. "Q. Do you ever recognize any party to deal in an account unless there is some power of attorney or signature cards or more, some document permitting that? "A. Signature card and letter."↩
4. This witness, also, made an affidavit in 1938 in which he stated that - "* * * Mr. Tripp and Mr. Miller * * * told me it was the account of the Phoenix Brewery * * *." This is consistent with the statement made by Miller in his affidavit that - "* * * Prior to the time Mr. William F. Donnelly opened the 'K. P. Steinreich' account, he stopped at my desk in the bank and told me that he wanted to open an account for the use of his brewery * * *"; but is contradicted by the approximately contemporaneous affidavit of Tripp to the effect that - "I knew, of course, that the account was actually Mr. Donnelly's account * * *;" by Miller's testimony on cross-examination at the hearing in this proceeding that "Which one did you understand the account belonged to, to the corporation [Phoenix Cereal Beverage Co.], or Mr. Donnelly personally? "I understood it belonged to Mr. Donnelly personally." and by petitioner himself at the hearing who testified "Are we then to understand that none of the transactions in the bank accounts in your name were for the account of or the benefit of the Phoenix Cereal Beverage Company? "They were for the account and benefit of William F. Donnelly. "Individually? "That is right. "And not as president of the brewery? "No."↩
5. Petitioner's own statement in this respect is: "* * * I learned in 1929 that Mr. Donnelly had been trading in the stock with Schuyler-Earl [one of the brokerage accounts] and it was transferred in 1929 so if there were any earnings and so forth it would naturally have been completely included in my income tax "and it was always in my name and it was - * * * As I learned they were in my name, I naturally would have to report." He was then asked: "You mean, you took this up on your income tax?" The Witness: "Yes." "And Donnelly didn't take it on his?" The Witness: "That is correct."↩